**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN SHANK, Derivatively on Behalf of MALIBU BOATS, INC., <br><br> Plaintiff, <br> v. <br><br> JACK D. SPRINGER, RITCHIE L. ANDERSON, BRUCE W. BECKMAN, DAVID S. BLACK, WAYNE R. WILSON, JAMES R. BUCH, IVAR S. CHHINA, MICHAEL J. CONNOLLY, MICHAEL K. HOOKS, MARK W. LANIGAN, JOAN M. LEWIS, PETER E. MURPHY, JOHN E. STOKELY, and NANCY M. TAYLOR, <br><br> Individual Defendants, <br> -and- <br><br> MALIBU BOATS, INC., <br><br> Nominal Defendant. | Case No. 1:24-cv-9018 <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Brian Shank ("**Plaintiff**"), by his attorneys, derivatively on behalf of Nominal Defendant Malibu Boats, Inc. ("**Malibu**" or the "**Company**") submits this Verified Stockholder Derivative Complaint against individual defendants Jack D. Springer, Ritchie L. Anderson, Bruce W. Beckman, David S. Black, Wayne R. Wilson, James R. Buch, Ivar S. Chhina, Michael J. Connolly, Michael K. Hooks, Mark W. Lanigan, Joan M. Lewis, Peter E. Murphy, John E. Stokely, and Nancy M. Taylor (collectively, the "**Individual Defendants**") for their breaches of fiduciary duties as directors and/or officers of Malibu, unjust enrichment, and violations of Sections 10(b), 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "**Exchange Act**"). Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge. This complaint is also based on the investigation

of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("**SEC**") and a review of news reports, press releases, and other publicly available sources. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Malibu against members of its board of directors (the "**Board**") and members of the Company's upper management. The wrongdoing alleged herein has caused substantial damage to Malibu's reputation, goodwill, and standing in the business community and has exposed Malibu to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Malibu in the form of, among other things, millions of dollars in losses to the Company's market capitalization. This action seeks to remedy wrongdoing committed by Malibu's directors and officers from November 4, 2022, through the present (the "**Relevant Period**").

2.      Malibu designs, manufactures, and markets recreational powerboats, which include performance sport, sterndrive, and outboard boats. The Company represents that it is a market leader in the performance sport category through its *Malibu* and *Axis* boat brands. The Company sells its boats via a network of independent dealers, including dealers operating under the common control of Tommy's Boats ("**Tommy's**"). In fiscal year 2023, sales to Tommy's dealers represented approximately 23.3% of consolidated sales for Malibu brand boats and approximately 10.7% of the Company's consolidated net sales.

3.      On February 20, 2024, before the market opened for trading, Malibu announced that the Company and its Chief Executive Officer ("**CEO**"), Defendant Jack D. Springer

("**Springer**"), had "mutually agreed" that Springer would no longer serve as CEO. No other reason for his departure was provided.

4.    On this news, the Company's stock price fell $4.33 or 9.1%, to close at $43.15 per share on February 20, 2024, on unusually heavy trading volume.

5.    On April 11, 2024, after the market closed, the Company revealed that Tommy's had sued Malibu in the United States District Court for the Eastern District of Tennessee,[1] alleging that the Company had "engaged in an elaborate scheme" to "pump nearly $100 million" worth of inventory into Tommy dealerships since late 2022 to "artificially inflate Malibu's sales performance." According to the complaint, Malibu forced the Company's highest priced, highest margin, slower to sell "*Malibu*" branded inventory (as opposed to the lower margin, but faster to sell "*Axis*") brand onto Tommy's dealerships.

6.    Malibu recognizes a sale when the dealer takes delivery of the boat, regardless of whether it has been sold to the end user. As a result, this scheme enabled the Company to report that it experienced strong wholesale demand and sales, even as sales to the end user declined. The Tommy's complaint alleged that, approximately one week prior to the Company announcing the departure of Defendant Springer, certain "Malibu stakeholders" admitted to the principal of Tommy's dealerships that Malibu was in fact "intentionally pumping Tommy's full of inventory." The complaint further alleged the Company withheld incentive payments it owed Tommy's for nearly two years before suddenly cutting ties with Tommy's.

7.    On this news, the Company's stock price fell $3.34, or 7.99%, to close at $38.48 per share on April 12, 2024, on unusually heavy trading volume. The Company's common stock

---

[1] The complaint was filed in the United States District Court for the Eastern District of Tennessee, styled *Tommy's Castaic, LLC et al v. Malibu Boats, Inc. et al,* Case No.: 3:24-cv-00166. The case was voluntarily dismissed on August 19, 2024 as part of a settlement, with Malibu agreeing to pay $3.5 million to Tommy's. The settlement also required Malibu to drop its $9.6 million claim against Tommy's in the bankruptcy case discussed herein.

price continued to fall during the next consecutive trading session, declining $2.34 or 6% to close at $36.14 per share on April 15, on unusually heavy trading volume.

8.      Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors that: (1) Malibu engaged in an "elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships"; (2) the Company artificially inflated Malibu's sales performance, market share, and stock value; (3) the Company was withholding certain incentives and rebates from its dealers; (4) the Company faced substantial risk of litigation from one of its top dealers, Tommy's; (5) the Company's CEO left Malibu due to his role in the scheme described herein; and (6) as a result of the foregoing, Defendants' positive statements about the Company's business operations, and prospects were materially misleading and/or lacked a reasonable basis.

9.      To make matters worse, Defendant Springer, along with other members of management, caused the Company to engage in the illicit scheme to dump inventory onto dealers in a concerted effort to misrepresent the Company's financial position, thus securing generous compensation and other lucrative financial awards, as enumerated in the Company's proxy statements filed on September 15, 2023, and September 19, 2024.

10.     As set forth herein, and as alleged in the ongoing federal securities class action in the United States District Court for the Southern District of New York styled *Retiree Benefit Trust of the City of Baltimore v. Malibu Boats, Inc., et al*, Case No. 1:24-cv-03254-LGS, (the "**Securities Class Action**"), Malibu's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) promulgated thereunder. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

13.    Venue is proper in this District because the Individual Defendants have been involved in business in this District. Further, the Individual Defendants' actions have had an effect in this District.

## THE PARTIES

### Plaintiff

14.    Plaintiff Brian Shank  is and has continuously been a stockholder of Malibu during the wrongdoing complained of herein.

### Nominal Defendant

15.    Defendant Malibu is a Delaware corporation with its principal executive offices located at 5075 Kimberly Way, Loudon, Tennessee 37774. Malibu's shares trade on the Nasdaq Global Select Market ("**NASDAQ**") under the ticker symbol "MBUU."

### Individual Defendants

#### *Officer Defendants*

16.    Defendant Jack D. Springer ("**Springer**") served as the Company's CEO from February 2010 to May 2024. He was a member of the Board from the Company's IPO in February 2014 until his resignation in May 2024. He was also a director of Malibu Boats Holdings, LLC

from May 2009 until the Company's recapitalization in connection with the IPO in February 2014. During the Relevant Period, Defendant Springer received at least $7,459,329 in total compensation from the Company. As of August 30, 2024, Defendant Springer owned 321,760 shares of Company common stock, representing 1.6% of the Company's voting power. Given that the price per share on that day was $36.37, Defendant Springer owned $11,702,411 worth of Company common stock. During the Relevant Period, Defendant Springer sold over $1.5 million worth of Malibu stock based on material nonpublic information ("**MNPI**").

17.     Defendant Ritchie L. Anderson ("**Anderson**") has served as the Company's President since February 2024. After the departure of Jack Springer in 2024, he served as a member of the Office of the CEO from May 2024 to August 2024. Defendant Anderson previously served as the Company's Chief Operating Officer ("**COO**") from September 2013 until his appointment as CEO. He joined the Company in July 2011 as the Company's Vice President of Operations. During the Relevant Period, Defendant Anderson has received at least $7,185,139 in total compensation from the Company. Moreover, as of August 30, 2024, Defendant Anderson owned 101,089 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Anderson owned $3,676,606.93 worth of Company common stock. During the Relevant Period, Defendant Anderson sold over $1 million worth of Malibu common stock while in possession of material nonpublic information ("**MNPI**").

18.     Defendant Bruce W. Beckman ("**Beckman**") has served as the Company's Chief Financial Officer ("**CFO**") since November 2023. During the Relevant Period, Defendant Beckman has received at least $1,142,266 in total compensation from the Company.

19.     Defendant David S. Black ("**Black**") served as the Company's Interim CFO from April 2023 to November 2023. Defendant Black has also served as the Company's Corporate

Controller since November 2020. Previously, Defendant Black served as the Company's Director of Internal Audit. During the Relevant Period, Defendant Black received at least $1,206,699 in total compensation from the Company.

20.    Defendant Wayne R. Wilson ("**Wilson**") served as the Company's CFO from November 2009 to May 2023. During the Relevant Period, Defendant Wilson received at least $1,340,666 in total compensation from the Company.

### *Current Director Defendants*

21.    Defendant James R. Buch ("**Buch**") has served as a Company director since the Company's IPO in February 2014. Defendant Buch is a member of the Audit Committee and the Nominating and Governance Committee. During the Relevant Period, Defendant Buch received at least $364,178 in total compensation from the Company. As of August 30, 2024, Defendant Buch owned 30,611 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Buch owned $1,113,322.10 worth of Company common stock.

22.    Defendant Ivar S. Chhina ("**Chhina**") has served as a Company director since the Company's IPO in February 2014. Defendant Chhina is Chair of the Audit Committee and is a member of the Nominating and Governance Committee. During the Relevant Period, Defendant Chhina received at least $394,219 in total compensation from the Company. As of August 30, 2024, Defendant Chhina owned 30,611 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Chhina owned $1,113,322.10 worth of Company common stock.

23.    Defendant Michael J. Connolly ("**Connolly**") has served as a Company director since the Company's IPO in February 2014. Defendant Connolly is Chair of the Nominating and Governance Committee and is a member of the Compensation Committee. During the Relevant

Period, Defendant Connolly received at least $380,200 in total compensation from the Company. As of August 30, 2024, Defendant Connolly owned 51,301 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Connolly owned $1,865,817.37 worth of Company common stock.

24.     Defendant Michael K. Hooks ("**Hooks**") has served as a Company director since the Company's IPO in February 2014 and is currently Chairman of the Board. He was also a director of the Malibu Boats Holdings, LLC from May 2009 until the Company's recapitalization in connection with the February 2014 IPO. Defendant Hooks is a member of the Nominating and Governance Committee. During the Relevant Period, Defendant Hooks received at least $433,606 in total compensation from the Company. As of August 30, 2024, Defendant Hooks owned 74,504 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Hooks owned $2,709,710.48 worth of Company common stock.

25.     Defendant Mark W. Lanigan ("**Lanigan**") has served as a Company director since the Company's IPO in February 2014. Defendant Lanigan was also a director of Malibu Boats Holdings, LLC from May 2009 until the Company's recapitalization in connection with the February 2014 IPO. Defendant Lanigan is Chair of the Compensation Committee and is a member of the Nominating and Governance Committee. During the Relevant Period, Defendant Lanigan received at least $384,205 in total compensation from the Company. As of August 30, 2024, Defendant Lanigan owned 73,951 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Lanigan owned $2,689,597.87 worth of Company common stock.

26.     Defendant Peter E. Murphy ("**Murphy**") has served as a Company director since the Company's IPO in February 2014. Defendant Murphy is a member of the Compensation

Committee and the Nominating and Governance Committee. During the Relevant Period, Defendant Murphy received at least $451.678 in total compensation from the Company. As of August 30, 2024, Defendant Murphy owned 31,311 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Murphy owned $1,138,781.07 worth of Company common stock.

27.    Defendant John E. Stokely ("**Stokely**") has served as a Company director since the Company's IPO in February 2014. Defendant Stokely is a member of the Audit Committee and the Nominating and Governance Committee. During the Relevant Period, Defendant Stokely received at least $364,178 in total compensation from the Company. As of August 30, 2024, Defendant Stokely owned 30,611 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Stokely owned $1,113,322.07 worth of Company common stock.

28.    Defendant Nancy M. Taylor ("**Taylor**") has served as a Company director since April 2023. Defendant Taylor is a member of the Audit Committee and the Nominating and Governance Committee. During the Relevant Period, Defendant Taylor received at least $258,984 in total compensation from the Company. As of August 30, 2024, Defendant Taylor owned 3,556 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Taylor owned $129,331.72 worth of Company common stock.

### *Former Director Defendant*

29.    Defendant Joan M. Lewis ("**Lewis**") served as a Company director from July 2019 until August 2024. Defendant Lewis was a member of the Compensation Committee and the Nominating and Governance Committee. During the Relevant Period, Defendant Lewis received at least $364,178 in total compensation from the Company. As of August 30, 2024, Defendant

Lewis owned 10,258 shares of Company common stock. Given that the price per share on that day was $36.37, Defendant Lewis owned $373,083.46 worth of Company common stock.

30.     Defendants Springer, Anderson, Beckman, Black, Wilson, Buch, Chhina, Connolly, Hooks, Lanigan, Murphy, Stokely, and Taylor may collectively be referred to herein as the "**Individual Defendants.**"

31.     The Individual Defendants, because of their positions with Malibu, possessed the power and authority to control the contents of Malibu's reports to the SEC, press releases, and presentations to investors and analysts. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to MNPI, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

### Relevant Non-Parties

32.     Steve D. Memento ("**Menneto**") has served as the Company's CEO and as a director since August 2024.

## SUBSTANTIVE ALLEGATIONS

### Background

33.     Malibu designs, manufactures, and markets recreational powerboats, including performance sport, sterndrive, and outboard boats. The Company purports to be a market leader in the performance sport boat category through its *Malibu* and *Axis* boat brands.

34.     The Company sells eight brands of boats, but its flagship product is the Malibu boat, which is purportedly designed for premium performance, comfort, and convenience. The

Axis boats are "a more affordable sport boat product but still demand high performance, functional simplicity, and the option to upgrade key features."

35.    The Company sells boats via a network of independent dealers, including dealers operating under the common control of Tommy's. In the fiscal year of 2023, sales to Tommy's dealers represented approximately 23.3% of consolidated sales for Malibu brand boats and approximately 10.7% of the Company's consolidated net sales.

36.    According to the Company's SEC filings, Malibu recognizes revenue when "control of promised goods (boats, parts, or other) is transferred to the customer." As "[d]dealers generally have no right to return unsold boats," Malibu recognizes revenue upon the delivery of the boats to the dealer, regardless of whether boats are ultimately sold to an end user.

**Springer Orchestrated an Accounting Scheme that Bankrupts Tommy's
and Exposes the Company to Liability**

37.    On April 10, 2024, Tommy's and its various subsidiaries filed an action in the United States District Court for the Eastern District of Tennessee, styled *Tommy's Castiac, LLC et al v. Malibu Boats, Inc. et al,* Case No.: 3:24-cv-00166, accusing Malibu of breach of contract, unjust enrichment, fraud, and negligent misrepresentation among other claims (the "**Tommy's Action**").[2]   The Tommy's Action alleged that Springer and Malibu management knew that the Company's 2023 sales would be 50% lower than 2022 sales and decided to take steps to shift the anticipated loss to Tommy's dealerships.

38.    First, Springer caused Malibu to coerce Tommy's into increasing its available floor plan financing from $50 million to $160 million by telling Tommy's that it should maintain 25 weeks of inventory in stock at the turn of the model year based on Malibu's market analysis.

---

[2] The allegations in Paragraphs 37 to 47 are drawn from the complaint filed in the Tommy's Action, annexed hereto as Exhibit 1.

39.    Malibu also withheld payments and incentives it contractually owed Tommy's to force it into entering additional floor space financing.  Ultimately bowing to the pressure, Tommy's increased its existing floor plan capacity from $50 million to $85 million with one lender and then $110 million with a $20 million overlimit with another lender.  Springer caused Malibu to represent to Tommy's lenders that Malibu would support the increased floor plan with a repurchase agreement, which would protect the lenders in the event of Tommy's default. Simply stated, Malibu promised it would repurchase Tommy's inventory, as it had done in the past, if Tommy's couldn't sell the boats. Malibu, however, failed to enter into the repurchase agreement.

40.    Malibu, instead, pressured Tommy's to expand its floor plan capacity to $120 million so Malibu would have a locale to dump its excessive inventory and book revenues. Specifically, Malibu dumped boats on Tommy's without any regard for what brand was likely to be sold in a timely manner.  Malibu larded Tommy's showrooms with Malibu's most expensive, highest margin boats, which took the longest periods of time to sell.  Tommy's had requested that Malibu send it Malibu's lower price point boats, which historically sold at a quicker pace.

41.    Malibu snubbed the request because the Company recognizes a sale when the dealer takes delivery of the boat, regardless of whether it has been sold to the end user. As a result, this scheme enabled the Company to report that it experienced strong wholesale demand and sales, even as sales to the end user declined.

42.     Notably, Malibu's dumping higher priced boats on Tommy's allowed Malibu to report higher sales figures than if it had dumped lower priced models on Tommy's.

43.    Malibu's decision to dump higher priced and harder to sell models on Tommy's made it nearly impossible for the distributor to hit its sales targets and saddled it with high interest debt.  Malibu exacerbated Tommy's problems when it reneged on making payments and refusing

to repurchase the inventory. According to the complaint filed in the Tommy's Action, three highly placed Malibu stakeholders told Matthew Borisch, a principal for Tommy's dealerships, that Springer intentionally pumped Tommy's full of inventory in order to inflate Malibu's sales and market share. They also reported that Springer "would not turn the spigot off." These principals further informed Borisch that the company's CFO left on "bad terms" and that "Jack is not going to last." Notwithstanding that high-ranking executives at Malibu knew Springer was engaging in accounting fraud, they took no steps to stop the machinations.

44.    Despite the negative outlook for boat sales in 2023, the general sales decline in the industry, and Malibu's actions towards Tommy's, the Company continued to tout positive sales performance and increased market share during the period.

45.    Malibu kept the "spigot" on and reported increased sales by dumping its excess inventory. Malibu exacerbated the situation by declining to enter into a repo agreement, which it had done in prior years, despite insisting that Tommy's increase its floor space.

46.    Tommy's filed for Chapter 11 bankruptcy protection on May 20, 2024.

47.    Following negotiations including a mediation in the bankruptcy, Malibu agreed to pay Tommy's $3.5 million and Malibu agreed to drop its $9.6 million claim against Tommy's.

### The Individual Defendants' False and Misleading Statements

48.    On November 4, 2022, Malibu issued a press release announcing its financial results for the first quarter of 2023 ended September 30, 2022, reporting in relevant part:[3]

> **First Quarter Fiscal 2023 Highlights Compared to First Quarter Fiscal 2022:**
> - Net sales increased 19.2% to $302.2 million
> - Unit volume increased 10.5% to 2,237 units
> - Gross profit increased 24.9% to $74.6 million
> - Net income increased 29.3% to $36.1 million
> - Adjusted EBITDA increased 27.6% to $57.1 million

---

[3] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

- Net income available to Class A Common Stock per share (diluted) increased 32.0% to $1.69 per share
- Adjusted fully distributed net income per share increased 30.7% to $1.79 per share on a fully distributed weighted average share count of 21.3 million shares of Class A Common Stock

* * *

"Supported by the continued strength across our brands, we maintained our momentum and delivered a record first quarter for fiscal year 2023, with net sales increasing 19.2%, net income increasing 29.3% and Adjusted EBITDA growing 27.6% compared to the prior year period. Our operating model, vertical integration capabilities and strategic leadership continue to shine through, helping us execute on our objectives and remain a market leader in the marine industry," commented Jack Springer, Chief Executive Officer of Malibu Boats, Inc.

49. That same day, the Company submitted its quarterly report for the period ended September 30, 2022, on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "**1Q23 10-Q**"). The 1Q23 10-Q reported $11 million in accrued dealer incentives expenses as of September 30, 2022. The 1Q23 10-Q also represented that the Company's revenue recognition included "boat and trailer sales" which consisted of "sales of boats and trailers to the Company's dealer network, net of sales returns, discounts, rebates and free flooring incentives."

50. In addition, the 1Q23 10-Q stated that the Company "aim[s] to increase our market share across the boating categories in which we compete through new product development, improved distribution, new models, and innovative features." Regarding the Company's inventory levels, the 1Q23 10-Q also represented, in relevant part:

Dealer inventories were lower than historical levels throughout fiscal years 2021, constrained production in the first half of fiscal year 2021, and our lower wholesale shipment levels during the second half of fiscal year 2020. Fiscal year 2022 retail demand continued at a strong pace, albeit at lower levels than the record fiscal year 2021 levels, in spite of limited inventory. During fiscal

year 2022, year-over-year increases in wholesale production and decreases in retail demand levels relative to fiscal year 2021 combined to increase inventory levels modestly at our Malibu and Cobalt segment dealers by the end of the fiscal year. **Dealer inventories continue to be well below historical levels and a full recovery to historical inventory levels will depend on the ability of our supply chain to provide materials to us timely and the level of retail demand during the upcoming year.**

51.    On February 7, 2023, Malibu announced its financial results for the second quarter

2023 ended December 31, 2022, in a press release, which reported, in relevant part:

**Second Quarter Fiscal 2023 Highlights Compared to Second Quarter Fiscal 2022:**

- Net sales increased 28.4% to $338.7 million
- Unit volume increased 17.7% to 2,439 units
- Gross profit increased 19.0% to $75.7 million
- Net income increased 17.5% to $36.4 million
- Adjusted EBITDA increased 19.7% to $57.6 million
- Net income available to Class A Common Stock per share (diluted) increased 22.0% to $1.72 per share
- Adjusted fully distributed net income per share increased 22.0% to $1.83 per share on a fully distributed weighted-average share count of 21.3 million shares of Class A Common Stock

* * *

"We once again delivered a fantastic quarter as our momentum continued with net sales increasing 28.4%, net income rising 17.5%, and Adjusted EBITDA growing 19.7% compared to the prior year. Our performance further solidifies our position as a trailblazer and innovator, while also demonstrating our ability to adapt and grow in the current environment," commented Jack Springer, Chief Executive Officer of Malibu Boats, Inc.

**"We are also encouraged by the resilient consumer appetite for large, feature-rich boats, which is evidenced by the strong demand we are seeing for our saltwater segment at regional boat shows across the country. While macro conditions remain uncertain, we are beginning to see incremental improvements across the supply chain, which we believe will allow channel inventory to normalize in the second half of the fiscal year for our Malibu and Cobalt segments and in the first half of fiscal 2024 for our Saltwater Fishing segment.** We remain confident in

our ability to execute in any macro environment, and we will continue to leverage the horsepower of our unmatched operational capabilities, vertical integration efforts, and visionary team to deliver profitable growth and long-term value for our shareholders," continued Mr. Springer.

52.   On February 7, 2023, the Company submitted its quarterly report for the period ended December 31, 2022, on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "**2Q23 10-Q**"). The 2Q23 10-Q reported $17.3 million in quarterly accrued expenses for dealer incentives as of December 31, 2022. The 2Q23 10-Q reported, in relevant part, the following concerning the Company's channels and inventory levels:

> Dealer inventories continue to be below historical levels and a full recovery to historical inventory levels will depend on the ability of our supply chain to provide materials to us timely and the level of retail demand during the upcoming year.
>
> * * *
>
> ***Current inventory levels at our dealers are still below pre-pandemic levels. The primary drivers for our restocking timing will be the retail demand for our products and our ability to increase production in light of ongoing supply chain challenges.*** Any meaningful increases or decreases in retail demand and improvements or degradations in supply chain logistics will be the key drivers of the speed of inventory restocking that will drive our wholesale production in the second half of fiscal year 2023. While retail activity at our dealers trended lower during the first half of fiscal year 2023, given low inventory levels at the beginning of the fiscal year, we expect wholesale demand to continue through the end of fiscal year 2023 and, with respect to certain brands, potentially beyond, in order to restock our dealer inventories. With respect to supply, we believe supply chain disruptions will continue to challenge some of our production output through at least the remainder of fiscal year 2023, with the ultimate duration and magnitude of these supply chain challenges being unknown. However, we have begun to notice incremental improvements across our supply chain. As a result, we believe our dealer inventory levels may begin to normalize in the second half of fiscal year 2023 for our Malibu and Cobalt segments and in the first half of fiscal 2024 for our Saltwater Fishing segment.

53.    On May 3, 2023, Malibu announced its financial results for the third quarter of 2023 ended March 31, 2023 in a press release, which reported, in relevant part:

**Third Quarter Fiscal 2023 Highlights Compared to Third Quarter Fiscal 2022**:
- Net sales increased 9.0% to $375.1 million
- Unit volume increased 2.9% to 2,637 units
- Gross profit increased 1.5% to $98.6 million
- Net income decreased 2.5% to $53.5 million
- Adjusted EBITDA decreased 0.6% to $79.3 million
- Net income available to Class A Common Stock per share (diluted) remained flat at $2.51 per share
- Adjusted fully distributed net income per share decreased 0.8% to $2.59 per share on a fully distributed weighted-average share count of 21.3 million shares of Class A Common Stock

* * *

"We delivered another solid quarter with sales growing 9.0% for another record quarter and net income and adjusted EBITDA coming in as expected. Our operational execution has been, and will continue to be, the hallmark of our success. The Malibu team demonstrated their resilience as we navigated through a, at times, choppy fiscal third quarter. ***We have made great strides in normalizing our channel inventory, particularly within our Malibu and Cobalt segments, allowing our dealers to be poised to satisfy customer demand as we enter the prime selling season.*** Within our Saltwater Fishing segment, demand throughout the boat show season was unwavering and at peak levels for the larger shows, and we feel particularly well positioned in this growing segment," commented Jack Springer, Chief Executive Officer of Malibu Boats, Inc.

54.    On May 3, 2023, the Company submitted its quarterly report for the period ended March 31, 2023, on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The report stated the following, in relevant part, concerning dealer inventory and demand:

***Dealer inventories began fiscal year 2023 below historical levels and over the course of the year have continued to normalize towards historical levels. We currently believe the Malibu and Cobalt inventory at our dealers is near historical seasonally adjusted levels and that the Saltwater Fishing inventory will approach historical seasonally adjusted levels shortly.***

17

* * *

> ***Current inventory levels at our dealers are normalizing to pre-pandemic levels across all segments.*** While retail activity at our dealers trended lower during the first half of fiscal year 2023, given low inventory levels at the beginning of the fiscal year, we continued to experience strong wholesale demand through the third quarter of fiscal year 2023. ***As channel inventory becomes more normalized, we believe wholesale demand will become more directly dependent on the underlying retail activity for our products.*** As a result, we believe our wholesale demand in the upcoming quarters will largely be driven by the retail activity for our products during our fourth fiscal quarter of 2023 and into the first fiscal quarter of 2024.

55. On August 29, 2023, Malibu announced its financial results for its fourth quarter and fiscal year 2023 ended June 30, 2023, in a press release, which reported, in relevant part:

> **Fourth Quarter Fiscal 2023 Highlights Compared to Fourth Quarter Fiscal 2022**
> - Net sales increased 5.4% to $372.3 million
> - Unit volume decreased 1.8% to 2,550 units
> - Gross profit increased 14.3% to $102.5 million
> - General and administrative expenses increased to $118.0 million primarily due to our settlement of a litigation matter for $100.0 million, which we expect will be tax deductible for federal and state income tax purposes
> - Net income decreased 136.3% to a net loss of $18.0 million
> - Adjusted EBITDA increased 21.9% to $90.1 million
> - Net income available to Class A Common Stock per share (diluted) decreased 137.2% to a net loss of $0.86 per share
> - Adjusted fully distributed net income per share increased 22.6% to $2.98 per share on a fully distributed weighted average share count of 21.3 million shares of Class A Common Stock
>
> **Fiscal Year 2023 Highlights Compared to Fiscal Year 2022**
> - Net sales increased 14.3% to $1,388.4 million
> - Unit volume increased 6.6% to 9,863 units
> - Gross profit increased 13.3% to $351.3 million
> - General and administrative expenses increased to $175.7 million primarily due to our settlement of a litigation matter for $100.0 million, which we expect will be tax deductible for federal and state income tax purposes
> - Net income decreased 34.0% to $107.9 million
> - Adjusted EBITDA increased 15.2% to $284.0 million
> - Net income available to Class A Common Stock per share

(diluted) decreased 32.6% to $5.06 per share

- Adjusted fully distributed net income per share increased 16.2% to $9.19 on a fully distributed weighted average share count of 21.3 million shares of Class A Common Stock

* * *

"Malibu closed out another solid quarter and fiscal year despite a challenging environment. For the fiscal year, we delivered a 14% increase in net sales while improving many of our other financial and operational metrics. Our financial and operational performance continues to demonstrate the strength of our business model and world-class team. *We've made great strides to meet demand throughout the fiscal year as we ramped up production through our first three quarters and reached normalized channel inventories faster than anticipated.* Despite the uncertain macro environment, we remain confident in our operational prowess to match wholesale and retail demand and provide what we believe are the highest quality boats on the market," commented Jack Springer, Chief Executive Officer of Malibu Boats, Inc.

* * *

*Our unit volume increased primarily due to strong wholesale restocking demand across our Cobalt and Saltwater Fishing segments, partially offset by reduced wholesale restocking demand at our Malibu segment.*

56.    On August 29, 2023, the Company submitted its annual report for the fiscal year ended June 30, 2023, on a Form 10-K filed with the SEC, affirming the previously reported financial results (the "**FY23 10-K**"). The FY23 10-K reported $14.99 million in accrued expenses arising from dealer incentives as of June 30, 2023. The FY23 10-K stated, in relevant part, the following concerning the Company's inventory levels:

> *Current inventory levels at our Malibu and Cobalt dealers have returned to prepandemic levels and at our Saltwater Fishing dealers are continuing to normalize to pre-pandemic levels.* While retail activity at our dealers trended lower during fiscal year 2023, given low inventory levels at the beginning of the fiscal year, *we continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023. As channel inventory becomes more normalized, we believe wholesale demand will become more directly dependent on the underlying retail activity*

19

> *for our products.* As a result, we believe our wholesale demand in
> the upcoming quarters will largely be driven by the retail activity for
> our products into the first half of fiscal year 2024.

57.    On September 15, 2023, the Company submitted its Annual Report to Shareholders

on a form ARS to the SEC, which reiterated the Company's prior statements concerning inventory

levels and reported positive market share gains:

> Our success is a testament to the drive and commitment of our
> outstanding team, as we *matched wholesale to retail demand and
> normalized our channels to meet the needs of our large, feature-
> rich boats. While the retail environment remained uncertain
> during fiscal year 2023, along with rising interest rates and
> weather-driven order delays, we persevered. We continued to gain
> market share across a number of our brands as we led the way
> with cuttingedge product design and innovation.* Further, we
> achieved record-setting net sales and adjusted EBITDA in fiscal
> year 2023 while continuing to meet our 20% adjusted EBITDA
> margin target [and recorded net income of $107.9 million].

58.    On October 31, 2023, Malibu announced its financial results for the first quarter

2024 ended September 30, 2023, in a press release, which stated in relevant part:

> **First Quarter Fiscal 2024 Highlights Compared to First Quarter
> Fiscal 2023:**
> -    Net sales decreased 15.3% to $255.8 million
> -    Unit volume decreased 24.1% to 1,698 units
> -    Gross profit decreased 23.9% to $56.8 million
> -    Net income decreased 42.5% to $20.8 million
> -    Adjusted EBITDA decreased 31.7% to $39.0 million
> -    Net income available to Class A Common Stock per share
>      (diluted) decreased 42.0% to $0.98 per share
> -    Adjusted fully distributed net income per share decreased 36.9%
>      to $1.13 per share on a fully distributed weighted-average share
>      count of 21.3 million shares of Class A Common Stock

59.    On October 31, 2023, the Company submitted its quarterly report for the period

ended September 30, 2023, on a Form 10-Q filed with the SEC, affirming the previously reported

financial results (the "**1Q24 10-Q**"). The 1Q24 10-Q reported $18.5 million in accrued expenses

arising from dealer incentives as of September 30, 2023. The 1Q24 10-Q also reported the

following concerning the Company's channel and inventory levels, as well as wholesale demand:

> ***Current inventory levels have now stabilized to pre-pandemic levels across all of our segments.*** While retail activity at our dealers trended lower during fiscal year 2023, given low inventory levels at the beginning of the fiscal year, ***we continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023. Now, as channel inventory is normalized,*** we believe wholesale demand will be directly dependent on the underlying retail activity for our products into the first half of fiscal year 2024.

60.    On January 30, 2023, Malibu announced its financial results for the second quarter 2024 ended December 31, 2023, in a press release, which stated in relevant part:

> **Second Quarter Fiscal 2024 Highlights Compared to Second Quarter Fiscal 2023:**
> -    Net sales decreased 37.7% to $211.1 million
> -    Unit volume decreased 43.7% to 1,373 units
> -    Gross profit decreased 50.5% to $37.5 million
> -    Net income decreased 72.1% to $10.1 million
> -    Adjusted EBITDA decreased 60.2% to $22.9 million
> -    Net income available to Class A Common Stock per share (diluted) decreased 71.5% to $0.49 per share
> -    Adjusted fully distributed net income per share decreased 68.9% to $0.57 per share on a fully distributed weighted-average share count of 21.1 million shares of Class A Common Stock

61.    On January 30, 2024, the Company submitted its quarterly report for the period ended December 31, 2023, on a Form 10-Q filed with the SEC, affirming the previously reported financial results (the "**2Q24 10-Q**"). The 2Q24 10-Q reported the Company had accrued $21.9 million in dealer incentives as of December 31, 2023. The 2Q24 10-Q also reported the factors affecting the Company's net sales, stating in relevant part:

> Net sales for the six months ended December 31, 2023 decreased $174.0 million, or 27.2%, to $466.9 million as compared to the six months ended December 31, 2022. ***The decrease in net sales was driven primarily by decreased unit volumes across all segments resulting primarily from decreased retail demand and increased dealer flooring program costs across all segments resulting from higher interest rates and increased inventory levels, partially offset by a favorable model mix across all segments and inflation-driven***

*year-over-year price increases.* Unit volume for the six months ended December 31, 2023, decreased 1,605 units, or 34.3%, to 3,071 units as compared to the six months ended December 31, 2022. Our unit volume decreased primarily due to lower wholesale shipments across all segments driven by lower retail activity during the period.

62.     The above statements were materially false and/or misleading and failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (1) Malibu engaged in an "elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships"; (2) the Company artificially inflated Malibu's sales performance, market share, and stock value; (3) he Company was withholding certain incentives and rebates from its dealers; (4) the company faced substantial risk of litigation from one of its top dealers, Tommy's; (5) the Company's CEO left the Company due to his role in this scheme; and (6) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Emerges**

63.     On February 20, 2024, before the market opened, Malibu suddenly announced that the Company and Defendant Springer had "mutually agreed" that Defendant Springer would cease to serve as CEO. As part of the transition, the Company announced it was "undertaking" a search for a new CEO. Specifically, the Company stated:

On February 15, 2024, Malibu Boats, Inc. (the "Company") and Mr. Jack Springer *mutually agreed* that Mr. Springer will cease to serve as Chief Executive Officer, *effective May 17, 2024 or at such earlier time as the Board may determine* (the "Transition Effective Time"), and accordingly the Company and Mr. Springer entered into a Transition, Release and Consulting Agreement (the "Transition Agreement"). Mr. Springer also will resign as a member of the Company's Board of Directors (the "Board"), effective at the Transition Effective Time.

64.     On this news, the Company's stock price fell $4.33 or 9.1%, to close at $43.15 per share on February 20, 2024, on unusually heavy trading volume.

65.     To make matters worse, on April 11, 2024, after the market closed, Malibu revealed that Tommy's had filed the Tommy's Action against the Company. After the Company disclosed the lawsuit, various media outlets publicized the complaint that had been filed in the Tommy's Action, which alleged the Company had "engaged in an elaborate scheme" to "pump nearly $100 million" worth of inventory into Tommy's dealerships since late 2022 to "artificially inflate Malibu's sales performance." According to the Tommy's complaint, Malibu forced the Company's highest priced, highest margin, slow moving "Malibu" branded inventory (as opposed to the lower margin, but faster moving "Axis" brand) onto Tommy's dealerships. As a result, this scheme enabled the Company to show that it experienced strong wholesale demand and sales, even as sales to the end user declined.

66.     The Tommy's Action also revealed that, approximately one week prior to the Company announcing the sudden departure of Defendant Springer, certain "Malibu stakeholders" admitted to the principal of Tommy's dealerships that Malibu was in fact "intentionally pumping Tommy's full of inventory," but advised Tommy's to "hold on" as "Jack [Springer] is not going to last." The Complaint further alleged the Company withheld payment of incentives from Tommy's for nearly two years before suddenly cutting ties with Tommy's.

67.     On this news, the Company's stock price fell $3.34 or 7.99%, to close at $36.14 per share on April 15, 2024, on unusually heavy trading volume.

## FIDUCIARY DUTIES

68.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continues to owe Malibu and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost

ability to control and manage Malibu in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Malibu and its stockholders to benefit all stockholders equally and not furtherance of their personal interest or benefit.

69.    Each Individual Defendant owes and continues to ow Malibu and its stockholders the fiduciary duties to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

70.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Malibu, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Malibu each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

71.    To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)    Ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)      Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States pursuant to UnitedHealth's own Code of Conduct;

(c)      Conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(d)      Remain informed as to how Malibu conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e)      Establish and maintain systematic and accurate records and reports of the business and internal affairs of Malibu, as well as procedures for reporting said reports and records to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)      Maintain and implement and adequately functioning system of internal, legal, financial, and management controls such that Malibu's operations comply with all applicable laws and that the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and Company's shareholders are accurate;

(g)      Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports of information that the Company was required by law to disseminate;

(h)      Examine and evaluate any reports of examination, audits, or other information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subject and duties set forth above; and

(i)    Truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

72.    The Individual Defendants, because of their advisory, executive, managerial, and directorial positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein and the content of the various public statements issued by Malibu.

73.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Malibu and were at all times acting within the course scope of such agency.

**Duties Pursuant to the Company's Code of Business Conduct**

74.    The Individual Defendants, as officers and/or directors of Malibu, were bound by the Company's Code of Conduct (the "**Code of Conduct**")[4] which stated the following:

> We will uphold the highest professional standards in all global business operations. We expect every director, officer and employee to read and understand the Code and its application to the performance of his or her business responsibilities. Please remember that you should consider not only your own conduct but also that of your immediate family members, your significant other or other persons who live in your household (referred to in the Code as "family members"). Likewise, the ethics of our suppliers, service providers and business partners is of utmost importance. We expect those with whom we do business to have, and follow, a similar code of ethical conduct. This Code requires unequivocally:
>
> -    Compliance with all applicable governmental laws, rules and regulations wherever Malibu operates;
> -    Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, and the appropriate self-disclosure to Malibu of any material transaction or relationship that

---

[4] *See* Malibu Boats, Inc. Code of Conduct (Feb. 2, 2023), https://s29.q4cdn.com/926843978/files/doc_downloads/gov-docs/2024/Code-of-conduct.pdf.

reasonably could be expected to give rise to such a conflict;
- Full, fair, accurate, timely and understandable reporting in Malibu's books and records and in all reports and documents that Malibu files with, or submits to, our external investors, accountants and auditors and in other public communications made by Malibu;
- Prompt internal reporting of violations of this Code or of any law affecting Malibu's business; and
- Accountability for failures to this Code.

While we are all obligated to follow this Code and are responsible and accountable for our own conduct, Malibu expects our leaders to set the example - to be in every respect a model. They must ensure that those who report to them have sufficient information to comply with law, regulation and policy, as well as the resources to resolve ethical dilemmas. They must foster and maintain a culture within Malibu that promotes the highest standards of ethics and compliance. We must never sacrifice ethical behavior and legal compliance in the pursuit of business objectives. Everyone is responsible and accountable for promptly reporting any potential violations of this Code or any law or regulation. We must do more than follow the letter of the law – we must do the right thing. Above and beyond strict legal compliance, each director, officer and employee is expected to observe high standards of business and personal ethics in the discharge of their assigned duties and responsibilities. This requires the practice of fair dealing, honesty and integrity by each director, officer and employee in every aspect of dealing with other Malibu employees, the public, the business community, stockholders, customers, suppliers, competitors and governmental and regulatory authorities.

75.    The "Fair Dealing" section of the Code of Conduct states the following:

We strive to outperform our competition fairly and honestly. Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical or illegal business practices. Statements regarding Malibu's services must not be untrue, misleading, deceptive or fraudulent. Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained, or inducing improper disclosure of confidential information from past or present employees of other companies is prohibited, even if motivated by an intention to advance our interests. If information is obtained by mistake that may constitute a trade secret or other confidential information of another business, or if you have any questions about the legality of proposed information gathering, you must consult your supervisor or the

27

Compliance Officer.

You are expected to deal fairly with our customers, suppliers, employees and anyone else with whom you have contact in the course of performing your job. Be aware that the Federal Trade Commission Act provides that "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." It is a violation of the Act to engage in deceptive, unfair or unethical practices and to make misrepresentations in connection with sales activities.

Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on normal commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special favors.

76.    The "Insider Trading" section of the Code of Conduct states the following:

Directors, officers and employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Directors, officers and employees must exercise the utmost care when handling material inside information. Please refer to the Company's Insider Trading Policy for more detailed information.

77.    The "Administration – Compliance Program and Compliance Officer" section of

the Code of Conduct states the following:

To facilitate compliance with this Code, we have implemented a compliance program ("Compliance Program") discussed below. We have established the position of the Compliance Officer to oversee this program. The Compliance Officer is a person to whom you can address any questions or concerns. The Compliance Officer for the purposes of this Code is the Company's Chief Human Resources Officer. In addition to fielding questions or concerns with respect to potential violations of this Code, the Compliance Officer is responsible for:

• investigating possible violations of this Code;

• training new employees in Code policies;

• conducting annual training sessions for certain employees to refresh such employees' familiarity with this Code;

• updating this Code as needed and alerting employees to any updates, with appropriate approval of the Committee to reflect changes in the law, the Company operations and in recognized best practices, and to reflect the Company experience; and

• otherwise promoting an atmosphere of responsible and ethical conduct.

Your most immediate resource for any matter related to this Code is your supervisor. Your supervisor may have the information you need or may be able to refer the question to another appropriate source. There may, however, be times when you prefer not to go to your supervisor. In these instances, you should feel free to discuss your concern with the Compliance Officer. If you are uncomfortable speaking with the Compliance Officer, please contact the Company's Chief Financial Officer. Of course, if your concern involves potential misconduct by another person and relates to questionable accounting or auditing matters, you may report that violation as set forth in such related policy. You may e-mail anonymously if you prefer, although the Compliance Officer may be unable to obtain follow-up details from you that may be necessary to investigate the matter. Whether you identify yourself or remain anonymous, your email contact will be kept strictly confidential to the extent reasonably possible within the objectives of this Code.

The Compliance Program will have the following minimum features:

A. All current directors, officers and employees and new hires and appointments will receive and will be required to acknowledge receipt and understanding of this Code, to include all policies referred herein.

B. While overall managerial oversight responsibility for the Compliance Program will reside in the executive officers of Malibu, Malibu will delegate day-to-day responsibility for the operation of the Compliance Program to the Compliance Officer.

C. The Compliance Officer will in the first instance be responsible

for ensuring compliance with the Code by, among other things, (i) timely documenting, reporting and investigating suspected material violations of the Code that come to their attention; (ii) ensuring the delivery of Code training and (iii) and making recommendations as to the implementation of any modifications and enhancements to any Malibu policy, practice or procedure, including the Code, and to the Compliance Program.

D. All employees are expected to cooperate fully in internal investigations of misconduct. Neither the reporting employee nor his or her supervisor may conduct any preliminary investigation, unless authorized to do so by the Compliance Officer. The Board, or the Audit Committee, will assess any findings from the investigation the Compliance Officer. The Board, or the Audit Committee, will assess any findings from the investigation changes that need to be made.

E. Malibu fosters a free and open atmosphere that allows and encourages directors, officers, employees and, agents and others to express work-related concerns about ethical issues and/or to report violations or suspected violations of laws, regulations and Malibu policy. Directors, officers and employees are not only encouraged, but are required, to report any violations of law or of this Code to his or her supervisor or to the Compliance Officer, as appropriate. If an employee believes his or her supervisor has not taken appropriate action, the employee should contact the Compliance Officer directly.

F. Timely periodic reports will be made to the Audit Committee about the activities of the Compliance Officer, as well as regarding material violations of the Code.

G. If any investigation indicates that a director, officer or employee has violated this Code or any law or regulation concerning the business of Malibu, such person will be held accountable and may face disciplinary measures up to, and including, termination of employment and, in appropriate cases, civil action or referral for criminal prosecution. Appropriate action may also be taken to deter any future Code violations.

H. Action by family members also may potentially result in ethical issues to the extent that they involve Malibu's business. For example, acceptance of inappropriate gifts by a family member from one of our suppliers could create a conflict of interest and result in a Code violation attributable to you. Employees should consider not only their own conduct, but also that of their family members.

I.    To encourage timely reporting, an employee hotline has been established and is monitored by the Compliance Officer. All employees will be advised of the existence of the employee hotline and their right to report suspected violations of law, and of this Code, even on an anonymous basis. The number of the employee hotline is (855) 400-6002. Whether the employee identifies himself or herself or remains anonymous, his or her call with the hotline will be kept strictly confidential to the extent reasonably possible within the objectives of the Code.

If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or the Compliance Officer; even the appearance of impropriety can be very damaging and should be avoided.

Malibu will not tolerate retaliation for reports made in good faith and provides full protection for those reporting violations. Anyone who retaliates or attempts to retaliate against a reporting employee will be subject to discipline, up to and including termination. Directors, officers and employees are expected to cooperate in internal investigations of misconduct. Any director, officer and employee may submit a good faith concern regarding questionable accounting or auditing matters without fear of dismissal or retaliation of any kind.

**Duties Pursuant to the Audit Committee Charter**

78.    In addition to these duties set forth in the Code of Conduct, Defendants Buch, Chhina, Stokely, and Taylor (the "**Audit Committee Defendants**"), who served on the Audit Committee during the Relevant Period, owed specific duties to Malibu under the Malibu Boats, Inc. Charter of the Audit Committee of the Board of Directors (the "**Audit Charter**").[5] Specifically, the Audit Charter described the purpose of the Audit Committee as follows:

The Committee is appointed by the Board to assist the Board in, among other things, overseeing the accounting and financial reporting processes and the audits of the financial statements of the Company and its financial risk management policies and controls and assisting the Board in fulfilling its responsibility for oversight

---

[5] *See* Audit Charter (Jan. 31, 2024), https://s29.q4cdn.com/926843978/files/doc_downloads/2024/01/31/MBUU-Audit-Committee-Charter-Final.pdf.

of the quality and integrity of the accounting, auditing, internal control and financial reporting practices of the Company. In addition, the Committee is appointed by the Board to assist the Board in overseeing the Company's risk management with respect to data privacy, cybersecurity and information technology risks.

79.     The "Responsibilities and Authority" section of the Audit Charter, states, in relevant part, that the Audit Committee shall have the following responsibilities, among others:

(7)    **Annual and Quarterly Results.** Review the Company's audited financial statements and quarterly financial results, including the related disclosures required by generally accepted accounting principles in the United States ("GAAP") and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and discuss them with management and the independent auditors. These discussions shall include any significant changes to the Company's accounting principles, the matters required to be discussed under the requirements of the PCAOB, the consideration of the quality of the Company's accounting principles as applied in its financial reporting, including a review of particularly sensitive accounting estimates, reserves and accruals, judgmental areas, audit adjustments (whether or not recorded), the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the financial statements of the Company, the Company's implementation process for any new accounting standards and other such inquiries as the Committee or the independent auditors shall deem appropriate as required to be communicated by the independent auditors to the Committee with respect to the review or audit of the Company's financial statements pursuant to applicable auditing standards adopted by the PCAOB. Based on such review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K. The Committee shall review and resolve any disagreements among management and the independent auditors or the internal auditing department in connection with the preparation of the audited financial statements or the quarterly financial statements.

(8)  **Proxy Report.** Issue annually a report of the Committee to be included in the Company's proxy statement as required by the rules and regulations of the SEC.

\* \* \*

(12)  **Press Releases.** Review and discuss with management, prior to release, the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP financial information, as well as financial information and earnings guidance provided to analysts or rating agencies.

\* \* \*

(14)  **Other Financial Disclosures.** Discuss with a representative of management and the independent auditors: (i) the interim financial information contained in the Company's Quarterly Report on Form 10-Q prior to its filing; (ii) the earnings announcement prior to its release (if practicable); and (iii) the results of the review of such information by the independent auditors. These discussions may be held with the Committee as a whole or with the Chair in person or by telephone.

\* \* \*

(16)  **Internal Control Over Financial Reporting.** Discuss and review with management, the internal auditors and the independent auditors, in connection with each annual or quarterly report filed with the SEC, the quality and effectiveness of and compliance with the Company's internal control over financial reporting, whether prior recommendations concerning internal controls made by the independent auditors have been implemented by management, and the adequacy of any disclosures about changes in internal control over financial reporting. This should include a discussion of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud, whether or not material, that includes management or other employees who have a significant role in the Company's internal control over financial reporting. On an annual basis, obtain a written report from management that describes management's own assessment of the effectiveness of such internal control over financial reporting and review the independent auditors' attestation

of management's report prior to the filing of the Company's annual report on Form 10¬K.

\* \* \*

(18) **Review of Financial and Accounting Practices.** Review with the independent auditors and management the extent to which changes or improvements in financial or accounting practices suggested by the auditors, as approved by the Committee, have been implemented. This review should be conducted at an appropriate time subsequent to implementation of changes or improvements, as decided by the Committee.

\* \* \*

(20) **Fraud and Regulatory Noncompliance.** Review all reports concerning any fraud or significant regulatory noncompliance that occur at the Company. This review should include, at a minimum, consideration of the Company's internal control over financial reporting that should be strengthened to reduce the risk of a similar event in the future and the impact on previously issued financial statements and reports filed with governmental authorities.

(21) **Significant Judgments.** Meet separately with each of management and the independent auditors regarding any significant judgments made in management's preparation of the Company's financial statements and the view of each as to appropriateness of such judgments, and review analyses prepared by management or the independent auditors setting forth any significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including with respect to alternative treatments of financial information within GAAP that have been discussed with management, the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors.

(22) **Proxy Disclosures.** Cooperate with management, the Board and the Company's legal counsel to ensure that the Company discloses in its proxy statement for its annual meeting of stockholders whether the Committee members are independent as described in this Charter and as defined by the applicable rules and regulations of the SEC and the

applicable Nasdaq rules, as well as certain information regarding any director of the Committee who is not independent.

(23) **Risk Assessment and Management.** Discuss with management and the independent and internal auditors the Company's major financial risk exposure and the steps management and the independent and internal auditors have taken to monitor and control such exposure, including the Company's risk assessment and risk management policies.

* * *

(33) **Other Matters.** Oversee and consider any other audit or financial statement related matters that may arise from time to time and develop appropriate recommendations for the Board.

80.      While the Audit Committee had clear responsibilities with respect to ensuring that there were controls regarding the accuracy of the Company's financial disclosures and the Company's communications with the public, it failed to fulfill these responsibilities. In fact, the Audit Committee Defendants have gravely harmed the Company by taking part in the publishing of false and misleading statements and/or omissions of material fact described herein.

**The False and Misleading Proxy Statement**

81.      In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue a false and misleading proxy statement, which was filed with the SEC on September 15, 2023, (the "**2023 Proxy**").

82.      The 2023 Proxy recommended that shareholders vote to elect Defendants Chhina, Connolly, and Lanigan to the Board to serve until the annual meeting in 2026 and the compensation of certain of the Company's executive officers. It also recommended that shareholders vote to ratify KPMG as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2024.

83.    The 2023 Proxy also stated the following regarding the Board's role in risk oversight at the Company:

> The Board believes that effective risk management involves our entire corporate governance framework. Both management and the Board have key responsibilities in managing risk throughout the Company, as shown below. Oversight of risks inherent in their respective areas of oversight are delegated to the various Board committees. At each regular meeting of the Board, the chairperson of each committee reports to the full Board regarding the matters reported and discussed at any committee meetings, including any matters relating to risk assessment or risk management. Our Chief Executive Officer, Interim Chief Financial Officer and outside legal counsel regularly attend meetings of these committees when they are not in executive session, and often report on matters that may not be otherwise addressed at these meetings. In addition, our directors are encouraged to communicate directly with members of management regarding matters of interest, including matters related to risk, at times when meetings are not being held. The Board believes that the processes it has established for overseeing risk would be effective under a variety of leadership frameworks and therefore do not materially affect its choice of leadership structure as described under "Board Leadership Structure" above.

84.    The 2023 Proxy stated the following regarding the Company's Code of Business Conduct and Code of Ethics:

> The Board has adopted a Code of Conduct applicable to our employees, directors and officers and a Code of Ethics. The Code of Ethics applies to our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions. The codes are available on the Corporate Governance section of our website at *investors.malibuboats.com/corporate-governance*. To the extent required by rules adopted by the SEC or Nasdaq, we intend to promptly disclose future amendments to certain provisions of the codes, or waivers of such provisions granted to executive officers and directors on our website at *www.malibuboats.com*.

85.    The 2023 Proxy stated the following regarding the Company's Clawback Policy:

> In fiscal 2022, the Board adopted a new clawback policy that permits us to clawback or recover cash and equity incentive compensation in the event of a material restatement of our financial statements or if a covered executive commits fraud during the course

of employment that causes financial or reputational harm to us. In the event of a material restatement of our financial statements, the clawback would apply to any amount awarded after September 15, 2021 and paid in the three-year period preceding the restatement that would not have been received if the financial statements had been correctly stated. In the event a covered executive commits fraud, all cash and equity compensation awarded after September 15, 2021 is subject to clawback. All of the currently employed Named Executive Officers are subject to the clawback policy. This clawback policy will be amended to comply with the new SEC and Nasdaq rules, and we intend to retain the flexibility to clawback compensation in the event a covered executive commits fraud, even though this clawback right is broader than required by the new rules.

86.    Defendants Springer, Buch, Chhina, Connolly, Hooks, Lanigan, Lewis, Murphy, and Stokely caused the 2023 Proxy to be false and misleading by failing to disclose that (1) the risk oversight functions of the Board and its committees were not being performed as described, as evidenced by the occurrence of the wrongdoing alleged herein, which involved members of the Board; and (2) though the 2023 Proxy claimed the Company's Code of Conduct applied to the Company's officers and directors, the Individual Defendants violated the Code of Conduct with no consequences.

87.    Defendants Springer, Buch, Chhina, Connolly, Hooks, Lanigan, Lewis, Murphy, and Stokely caused the 2023 Proxy to be false and misleading by failing to disclose that: (1) Malibu engaged in an "elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships"; (2) the Company artificially inflated Malibu's sales performance, market share, and stock value; (3) the Company was withholding certain incentives and rebates from its dealers; (4) the Company faced substantial risk of litigation from one of its top dealers, Tommy's; (5) the Company's CEO departed due to his role in this scheme; and (6) as a result of the foregoing, Defendants' positive

statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

88.     As a result of the Company's false and misleading statements in the 2023 Proxy, the Company's stockholders made uninformed decisions when voting to reelect the above defendants as proposed in the 2023 Proxy.

## BREACHES OF DUTIES

89.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Malibu, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

90.     The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the Company's "elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships". As a result, the Company artificially inflated Malibu's sales performance, market share, and stock value. The Company was also withholding certain incentives and rebates from its dealers and that, because of the foregoing, the Company faced substantial risk of litigation from one of its top dealers, Tommy's, and the Company's CEO departed due to his role in this scheme as described herein. The Individual Defendants also breached their duty of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Malibu substantial damage.

91.     The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of

loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Malibu's public statements and internal control functions.

92.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Malibu, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Securities Class Action, which alleges violations of federal securities laws. As a result, Malibu has expended, and will continue to expend, significant sums of money.

## IN REPURCHASING STOCK, MALIBU RELIED ON THE INDIVIDUAL DEFENDANTS' FALSE OR MISLEADING STATEMENTS

93.    In purchasing common stock in connection with the stock repurchase program, Malibu relied on the Individual Defendants' false or misleading statements, either directly or through the "fraud on the market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and *Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014), or through the doctrine articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

94.    Throughout the Relevant Period, Malibu justifiably expected the Individual Defendants to disclose material information as required by law and SEC regulations in the Company's periodic filings with the SEC and in statements made to the investing public. Malibu would not have purchased its securities at artificially inflated prices had the Individual Defendants disclosed all material information known to them or was so obvious it should have been known to them, as detailed herein. Thus, reliance by Malibu should be presumed with respect to the

Individual Defendants' omissions of material information as established by the *Affiliated Ute* presumption of reliance.

95.    Additionally, the "fraud on the market" presumption applies to the Individual Defendants' misstatements of material facts or failures to disclose material facts.

96.    At all relevant times, the market for Malibu stock was an efficient market for the following reasons, among others:

a.   Malibu stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient market;

b.   As a regulated issuer, Malibu filed periodic public reports with the SEC and the Nasdaq;

c.   Malibu regularly and publicly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.   Malibu was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace; and

e.   The market price of Malibu's stock reacted rapidly to new information entering the market.

97.    As a result of the foregoing, the market for Malibu stock promptly digested current information regarding the Company from all publicly available sources and reflected such

information in the price of Malibu's common stock. The foregoing facts indicate the existence of an efficient market for trading in  Malibu's stock and support application of the fraud-on-the-market doctrine.

98.    Malibu relied on the integrity of the market price for the repurchase of its common stock and is entitled to a presumption of reliance with respect to the Individual Defendants' misstatements and omissions alleged herein.  Had Malibu known of the material adverse information not disclosed by the Individual Defendants or been aware of the truth behind the Individual Defendants' material misstatements, the Company would not have purchased Malibu stock at artificially inflated prices.

### NEITHER THE STATUTORY "SAFE HARBOR" NOR THE "BESPEAKS CAUTION" DOCTRINE APPLIES TO THE INDIVIDUAL DEFENDANTS' MISREPRESENTATIONS

99.    Neither the safe-harbor provision of the Private Securities Litigation Reform Act of 1995 ("**PSLRA**") nor the judicially created "bespeaks caution" doctrine applicable to forward looking statements under certain circumstances applies to any of the false or misleading statements pleaded herein. None of the subject statements constituted a forward-looking statement; rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

100.    Alternatively, to the extent any of the false or misleading statements pleaded herein could be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important fact that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent the PSLRA's safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Individual Defendants are liable for those false or misleading forward-looking statements pleaded herein

because, at the time each such statement was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Malibu or an Individual Defendant who knew that the statement was materially false or misleading when made. None of the historic or present tense statements made by the Individual Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Individual Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## INSIDER SELLING

101.    Before the full disclosure by Malibu of the omitted material information discussed herein, Defendants Springer and Anderson ("**Insider Trading Defendants**") sold 45,833 shares of Malibu common stock for collective proceeds of approximately $2.5 million while in possession of MNPI.

102.    Defendant Springer sold 25,000 Malibu shares, while the price of the Company's stock was artificially inflated for approximately $1,501,402 in proceeds while in possession of MNPI. As CEO, Defendant Springer knew the truth about (1) the scheme to dump high priced, high margin, slow moving inventory into Tommy's dealerships; (2) the resulting liability risk; (3) his involvement; and (4) that, as a result, the Company artificially inflated its sales performance, market share, and stock value.

103.    Defendant Anderson sold 20,833 Malibu shares, while the price of the Company's stock was artificially inflated for approximately $1,052,388 in proceeds while in possession of MNPI. As COO, Defendant Anderson knew the truth about (1) the scheme to dump high priced,

high margin, slow moving inventory into Tommy's dealerships; (2) the resulting liability risk; (3) Springer's involvement; and (4) that, as a result , the Company artificially inflated its sales performance, market share, and stock value.

## DAMAGES TO MALIBU

104.    As a direct and proximate result of the Individual Defendants' conduct, Malibu has expended and will continue to expend significant sums of money.

105.    Such expenditures include, but are not limited to, legal fees associated with the aforementioned Securities Class Action of amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, and payments associated with the aforementioned issues.

106.    As a direct result of the Individual Defendants' conduct, Malibu has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock price in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

107.    Plaintiff repeats and re-alleges each and every allegation above as though fully set forth herein.

108.    Plaintiff brings this action derivatively and for the benefit of Malibu to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Malibu, unjust enrichment, and violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act.

109.    Malibu is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

110.    Plaintiff is, and has been continuously at all relevant times, a stockholder of Malibu. Plaintiff will adequately and fairly represent the interests of Malibu in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

111.    A pre-suit demand on the Board of Malibu is futile and, therefore, excused. At the time of filing this action, the Board consists of nine directors: Individual Defendants (i) Buch, (ii) Chhina, (iii) Connolly, (iv) Hooks, (v) Lanigan, (vi) Murphy, (vii) Stokely, and (viii) Taylor, as well as non-party (ix) Menneto (the "**Demand Board**"). Plaintiff needs only to allege demand futility as to a majority of the directors (*i.e.,* five directors) who are on the Board at the time this action is commenced.

112.    Plaintiff did not make a demand on the Demand Board prior to bringing this stockholder derivative suit because, as set forth below, a majority of the Demand Board faces a substantial likelihood of personal liability and is therefore incapable of making an independent and disinterested decision to bring the claims herein.

A.  <u>**The Board Faces a Substantial Likelihood of Liability**</u>

113.    Demand is excused as to all eight defendants on the Demand Board because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements regarding its "elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships". As a result, the Company artificially inflated Malibu's sales performance, market share, and stock value. The Company was also withholding certain incentives and rebates from its dealers and that, because of the foregoing, the Company faced substantial risk

of litigation from one of its top dealers, Tommy's, and the Company's CEO departed due to his role in this scheme as described herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. The Demand Board defendants breached their fiduciary duties, face a substantial likelihood of liability and are not disinterested. Demand upon them is futile and this excused.

114.    The Demand Board defendants, together and individually, violated and breached their fiduciary duties by knowingly approving and/or permitting the wrongs alleged herein and participating in efforts to conceal those wrongs.

115.    Additionally, the eight defendants on the Demand Board willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

116.    The Demand Board defendants, as members of the Board, were and are subject to Malibu's Code of Conduct. The Demand Board defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Demand Board defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

117.    Moreover, the Audit Committee Defendants solicited the 2023 Proxy. The 2023 Proxy was false and misleading in violation of Section 14(a) of the Exchange Act. Therefore, demand upon them is futile and further excused.

**B.  <u>Additional Demand Futility Allegations</u>**

118.    Demand is further excused as to Defendant Buch. Defendant Buch served as a

Company director since February 2014. The Company provides Defendant Buch with significant compensation for his role as stated above. As such, Defendant Buch cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Buch render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Buch breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Buch is futile and excused.

119. Demand is further excused as to Defendant Chhina. Defendant Chhina served as a Company director since February 2014. The Company provides Defendant Chhina with significant compensation for his role as stated above. As such, Defendant Chhina cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Chhina render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a Company director he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Chhina breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Chhina is futile and excused.

120. Demand is further excused as to Defendant Connolly. Defendant Connolly served as a Company director since February 2014. The Company provides Defendant Connolly with

significant compensation for his role as stated above. As such, Defendant Connolly cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Connolly render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a Company director he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Connolly breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested. Thus, demand upon Defendant Connolly is futile is excused.

121.    Demand is further excused as to Defendant Hooks. Defendant Hooks is Chairman of the Board and served as a Company director since February 2014. The Company provides Defendant Hooks with significant compensation for his role as stated above. As such, Defendant Hooks cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Hooks render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Hooks breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Hooks is futile and excused.

122.    Demand is further excused as to Defendant Lanigan. Defendant Lanigan served as a Company director since February 2014. The Company provides Defendant Lanigan with significant compensation for his role as stated above. As such, Defendant Lanigan cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Lanigan render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Lanigan breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Lanigan is futile and excused.

123.    Demand is further excused as to Defendant Murphy. Defendant Murphy served as a Company director since February 2014. The Company provides Defendant Murphy with significant compensation for his role as stated above. As such, Defendant Murphy cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Murphy render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Murphy breached his fiduciary duties, faces a substantial likelihood of liability,

and is neither independent nor disinterested. Thus, demand upon Defendant Murphy is futile and excused.

124.    Demand is further excused as to Defendant Stokely. Defendant Stokely served as a Company director since February 2014. The Company provides Defendant Stokely with significant compensation for his role as stated above. As such, Defendant Stokely cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company because that would expose him to liability. This lack of independence and the financial benefits received by Defendant Stokely render him incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, he consciously disregarded his duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result, Defendant Stokely breached his fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Stokely is futile and excused.

125.    Demand is further excused as to Defendant Taylor. Defendant Taylor served as a Company director since April 2023. The Company provides Defendant Taylor with significant compensation for her role as stated above. As such, Defendant Taylor cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company because that would expose her to liability. This lack of independence and the financial benefits received by Defendant Taylor render her incapable of impartially considering a demand to commence and vigorously prosecute this action. Further, as a trusted Company director, she consciously disregarded her duties to protect corporate assets by conducting little, if any, oversight to prevent the scheme that caused the Company to make false and misleading statements. As a result,

Defendant Taylor breached her fiduciary duties, faces a substantial likelihood of liability, and is neither independent nor disinterested. Thus, demand upon Defendant Taylor is futile and excused.

126.    Furthermore, Defendants Buch, Chhina, Stokely, and Taylor have served as members of the Audit Committee during the Relevant Period. As such, they are responsible for the integrity of Malibu's financial statements. Specifically, the Audit Charter provides that the Audit Committee is responsible for:

> The Committee is appointed by the Board to assist the Board in, among other things, overseeing the accounting and financial reporting processes and the audits of the financial statements of the Company and its financial risk management policies and controls and assisting the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing, internal control and financial reporting practices of the Company. In addition, the Committee is appointed by the Board to assist the Board in overseeing the Company's risk management with respect to data privacy, cybersecurity and information technology risks.

127.    In their capacities as Audit Committee members, Defendants Buch, Chhina, Stokely, and Taylor reviewed and approved materially misleading statements and allowed the m to be disseminated in Malibu's SEC filings and other disclosures. Thus, Defendants Buch, Chhina, Stokely, and Taylor breached their fiduciary duties, are not disinterested, and demand is excused as to them for this additional reason.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 14(a) of the Exchange Act*

128.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

129.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not

sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

130.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

131.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

132.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2023 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

133.    The false and misleading elements of the annual Proxies led to the re-elections of several of the Individual Defendants to the Board, allowing them to continue breaching their

fiduciary duties to Malibu.

134.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy.

135.    Plaintiff, on behalf of Malibu, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

136.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

137.    The Individual Defendants, by virtue of their positions with Malibu and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Malibu and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Malibu to engage in the illegal conduct and practices complained of herein.

138.    Plaintiff, on behalf of Malibu, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants
*for Breach of Fiduciary Duties*

139.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Malibu's business and affairs as directors and/or officers of the Company.

141.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry, causing the Company to engage in the misconduct described herein.

142.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

143.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

144.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent its publicly reported financials. These actions could not have been a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

145.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain

adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

146.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

147.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Malibu has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

148.    Plaintiff, on behalf of Malibu, has no adequate remedy at law.

## FOURTH CLAIM

### Against Defendants Anderson and Springer
*for Unjust Enrichment*

149.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Defendants Anderson and Springer were unjustly enriched at the expense and to the detriment of Malibu.

151.    The Defendants Anderson and Springer either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Malibu tied to the performance or artificially inflated valuation of Malibu, or received compensation that was unjust in light of the

Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

152.    Plaintiff, as a stockholder and a representative of Malibu, seeks restitution from the Demand Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by Defendants Anderson and Springer due to their wrongful conduct and breach of their fiduciary duties.

153.    Plaintiff, on behalf of Malibu, has no adequate remedy at law.

## FIFTH CLAIM

**Against the Individual Defendants**
*for Violations of Section 10(b) of the Exchange Act and SEC Rule 10(b)-5*

154.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.    During the Relevant Period, the Individual Defendants disseminated or approved materially false and misleading public statements in regard to (1) the "elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen Tommy's dealerships"; (2) the substantial risk of litigation from one of its top dealers, Tommy's because of the scheme; and (3) the Company's CEO's role in this scheme. As a result, positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.  Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing financial harm to the Company.

156.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Malibu, their control over, and/or receipt and/or modification of Malibu's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Malibu, participated in the fraudulent scheme alleged herein.

157.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the time in issue without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

158.    The Individual Defendants were among the senior management and the directors of the Company during the Relevant Period. Based on their roles at the Company, the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

159.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at

the Company, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

160.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

161.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud; and

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

## **PRAYER FOR RELIEF**

**FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Malibu, and that Plaintiff is an adequate representative of the Company;

B.    Finding that any demand upon the Board concerning the wrongdoing complained of herein would be futile;

C.    Determining and awarding to Malibu the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.    Directing Malibu and the Individual Defendants to take all necessary

actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Malibu and its stockholders from a repeat of the damaging events described herein;

E.     Awarding Malibu restitution from Individual Defendants;

F.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 25, 2024

**LEVI & KORSINSKY, LLP**

By: /s/ *Gregory M. Nespole*
Gregory M. Nespole (GN 6820)
Daniel Tepper
Correy A. Suk
Sidharth Kakkar
33 Whitehall Street, 17th Floor
New York, NY 10004
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
dtepper@zlk.com
csuk@zlk.com
skakkar@zlk.com

**KUEHN LAW, PLLC**
Justin A. Kuehn
53 Hill Street, Suite 605
Southampton, NY 11968
Phone: (833) 672-0814
justin@kuehn.law

*Counsel for Plaintiff*

## VERIFICATION

I, Brian Shank, have reviewed the allegations made in this Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Malibu Boats, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this __21st__ day of November 2024.

Brian Shank (Nov 21, 2024 19:49 EST)

BRIAN SHANK